UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

RAMONA MANZI, MICHAEL FOLEY, ALENE PEACEMAN, MICHELLE RUBIN, and LESLIE ELLIOTT, on behalf of themselves, individually, and on behalf of all others similarly-situated,

Plaintiffs,

-against-

AIC HOTEL GROUP, LLC, and ALL INCLUSIVE COLLECTION, LLC,

Defendants.

**COMPLAINT**

Civil Case No.:

1:26-cv-6534

**COLLECTIVE ACTION**

**JURY TRIAL DEMANDED**

Plaintiffs Ramona Manzi ("Ms. Manzi"), Michael Foley ("Mr. Foley"), Alene Peaceman ("Ms. Peaceman"), Michelle Rubin ("Ms. Rubin"), and Leslie Elliott ("Ms. Elliott"), on behalf of themselves, individually, and on behalf of all others similarly-situated ("FLSA Plaintiffs" and/or "ADEA Plaintiffs"), individually (collectively, "Plaintiffs"), by and through their attorneys, STEVENSON MARINO LLP, as and for their Complaint against AIC Hotel Group, LLC, and All Inclusive Collection, LLC (collectively, "AIC," "the Company," or "Defendants"), allege upon knowledge as to themselves and their own actions, and upon information and belief as to all other matters, as follows:

## NATURE OF THE CASE

1. This is a civil action for damages and equitable relief based upon the willful violations that Defendants committed of Plaintiffs' rights guaranteed to them by: (i) the overtime provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207(a); (ii) the anti-discrimination provisions of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq*.; (iii) the anti-retaliation provisions of the ADEA; (iv) the New York Labor Law

("NYLL") § 194; (v) one of the anti-retaliation provisions of the NYLL, NYLL § 215; (vi) the Massachusetts Fair Employment Practices Act, M.G.L. c. 151B; (vii) the Massachusetts Wage Act, M.G.L. c. 149, § 148, and its anti-retaliation provision, M.G.L. c. 149, § 148A; (viii) the California Labor Code, including California Labor Code § 203; and (ix) any other cause(s) of action that can be inferred from the facts set forth herein.

2. Defendants operate a portfolio of luxury resort properties throughout the United States, Mexico, and the Caribbean, including the UNICO, Nobu, and Hard Rock branded hotels, Eden Roc Miami Beach, and AVA Resort Cancun, which Defendants market to affluent travelers through relationships with luxury travel advisors, consortia, and industry partners.

3. In 2025, Defendants assembled a seven-member "Luxury Sales Team" (the "Luxury Team" or "LUX Team") of seasoned sales professionals, each recruited to promote the Company's luxury brands and drive revenue through relationships with high-end travel agencies, consortia, and advisors.

4. Every member of the Luxury Team, including each Plaintiff, was over the age of fifty, and most were over the age of fifty-five.

5. As described below, Defendants misclassified Plaintiffs and all other members of the Luxury Team as exempt from overtime under the purported "outside sales" exemption, even though Plaintiffs supervised no employees, had as their primary duty the making of sales, worked principally from fixed home offices by telephone and email, and were never paid a single dollar in commissions for any of their sales.

6. Indeed, Defendants unlawfully reassigned Plaintiffs' sales to other, substantially younger employees who were paid commissions on a regular basis, confirming that Plaintiffs lacked the central hallmark of the outside sales exemption, and then argued that Plaintiffs' lack of

sales – i.e., the very sales that were reassigned to other younger employees – justified eliminating their positions.

7. Despite routinely working well in excess of forty hours per week, Plaintiffs were never paid any overtime compensation.

8. Defendants compounded this wage theft with blatant age discrimination. After mining Plaintiffs' decades of experience for industry contacts and taking credit for their work, and after repeatedly assuring Plaintiffs that their positions were secure, Defendants eliminated the entire Luxury Team on a single business days' notice on January 6, 2026, only to retain and hire substantially younger, less experienced employees in their twenties and thirties to perform the same work.

9. Defendants' decision was both discriminatory and retaliatory, choosing to terminate their employment before paying them their owed, vested bonuses in response to their repeated complaints of sales data manipulation.

10. That is, throughout their employment, Plaintiffs and their Director repeatedly complained about Defendants' manipulation of the Salesforce database used to assign accounts and calculate commissions, and about Defendants' failure to pay their earned wages, commissions, and bonuses. Rather than investigate or remedy these improper practices, Defendants answered Plaintiffs' protected complaints with reassignment of their accounts, exclusion, and, ultimately, termination.

11. Because other employees over the age of fifty were subjected to the same unlawful policies and practices, Plaintiffs Manzi, Foley, Peaceman, and Rubin bring this action as a collective action under the FLSA, 29 U.S.C. § 216(b), and the ADEA, 29 U.S.C. § 626(b), on behalf of themselves, individually, and on behalf of all other persons similarly-situated.

12. In addition, Plaintiffs Manzi, Foley, Rubin, and Peaceman assert individual claims under the New York, Massachusetts, and California laws applicable to their respective employment.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

13. On May 16, 2026, Ms. Manzi filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), docketed as Charge No. 520-2026-06126, against Defendants, alleging age discrimination and retaliation in violation of the ADEA.

14. Ms. Manzi filed the charge on her own behalf and on behalf of a putative collective of similarly situated employees over the age of fifty-five, including Mr. Foley, Ms. Rubin, Ms. Peaceman, and Ms. Elliott.

15. On August 20, 2026, the EEOC issued Ms. Manzi a Determination and Notice of Rights, notifying her of her right to sue Defendants on the charge. Plaintiffs have commenced this action within ninety days of receipt of that notice.

16. Separately, Mr. Foley submitted a request for a private right of action to the Office of the Massachusetts Attorney General concerning Defendants' violations of the Massachusetts wage and discrimination laws. On October 6, 2026, the Office of the Attorney General issued Mr. Foley a letter authorizing him to pursue a private right of action against AIC Hotel Group under Massachusetts law.

17. Mr. Foley has therefore exhausted his administrative remedies as to his individual Massachusetts claims.

## JURISDICTION AND VENUE

18. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, as this action arises under the FLSA, 29 U.S.C. § 201 et seq., and the ADEA, 29 U.S.C. § 621 *et seq*.

19. The supplemental jurisdiction of the Court is invoked pursuant to 28 U.S.C. § 1367 over all claims arising under New York, Massachusetts, and California law, as those claims arise out of a common nucleus of operative facts and form part of the same case or controversy.

20. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the claims for relief occurred within this judicial district, including the employment and termination of Ms. Manzi, who worked for Defendants in and covering the State of New York and resides within this judicial district, and who serves as the collective action representatives for both the FLSA and ADEA.

## PARTIES

***Plaintiffs***

21. Plaintiff Ramona Manzi is a seventy-two-year-old individual who, at all times relevant to this Complaint, was and is a resident of Kings County, New York.

22. Defendants employed Ms. Manzi as a Regional Sales Executive covering the Northeast territory. At all relevant times herein, Ms. Manzi was a "person" and an "employee" of Defendants within the meaning of the FLSA, the ADEA, and the NYLL.

23. Plaintiff Michael Foley is a sixty-one-year-old individual who, at all times relevant to this Complaint, worked for Defendants as a Sales Executive, and later Team Lead, covering the New England region, including the Commonwealth of Massachusetts.

24. At all relevant times herein, Mr. Foley was a "person" and an "employee" of Defendants within the meaning of the FLSA, the ADEA, and the Massachusetts wage and anti-discrimination laws.

25. Plaintiff Alene Peaceman is a sixty-five-year-old individual who, at all times relevant to this Complaint, worked for Defendants as a Sales Executive covering the California territory.

26. At all relevant times herein, Ms. Peaceman was a "person" and an "employee" of Defendants within the meaning of the FLSA, the ADEA, and the California Labor Code.

27. Plaintiff Michelle Rubin is a fifty-eight-year-old individual who, at all times relevant to this Complaint, worked for Defendants as a Sales Executive covering the California territory.

28. At all relevant times herein, Ms. Rubin was a "person" and an "employee" of Defendants within the meaning of the FLSA, the ADEA, and the California Labor Code.

29. Plaintiff Leslie Elliott is a fifty-nine-year-old individual who, at all times relevant to this Complaint, worked for Defendants as a Regional Sales Executive.

30. At all relevant times herein, Ms. Elliott was a "person" and an "employee" of Defendants within the meaning of the FLSA and the ADEA.

***Defendants***

31. At all relevant times herein, Defendant AIC Hotel Group, LLC was and is a limited liability company doing business under the name AIC Hotel Group, with its principal place of business located at 55 Miracle Mile, Miami, Florida 33134.

32. At all relevant times herein, Defendant All Inclusive Collection, LLC was and is a limited liability company doing business as AIC Hotel Group, with its principal place of business located at 55 Miracle Mile, Miami, Florida 33134.

33. Defendants own, operate, and manage a portfolio of luxury resort properties and employed Plaintiffs and all similarly situated individuals as members of their sales force.

34. At all relevant times herein, Defendants were "employers" within the meaning of the FLSA and the ADEA. Defendants employed more than fifty employees, well in excess of the statutory thresholds for coverage under the FLSA and the ADEA, Defendants' qualifying annual business exceeds $500,000.00, and Defendants were and are engaged in interstate commerce within the meaning of the FLSA, in that they marketed and sold hospitality and travel services to customers across state lines and internationally, the combination of which subjects Defendants to the FLSA's overtime requirements as an enterprise.

**FLSA COLLECTIVE ACTION ALLEGATIONS**

35. Plaintiffs seek to bring this suit to recover from Defendants unpaid overtime compensation and liquidated damages pursuant to the applicable provisions of the FLSA, 29 U.S.C. § 216(b), on their own behalf, as well as on behalf of those in the following collective:

> Current and former sales employees who, during the applicable FLSA limitations period, were classified by Defendants as exempt from overtime, were not paid commissions for their sales, performed work in excess of forty hours in a workweek, and who consent to file a claim to recover damages for: (1) overtime compensation that is legally due to them; and/or (2) liquidated damages that are legally due to them ("FLSA Plaintiffs").

36. Defendants treated Plaintiffs and all FLSA Plaintiffs similarly in that Plaintiffs and all FLSA Plaintiffs: (1) performed similar tasks as sales employees, as described in the "Background Facts" section below; (2) were subject to the same laws and regulations; (3) were classified as exempt and paid in the same or similar manner; (4) were required to work in excess

of forty hours in a workweek; and (5) were not paid the required one and one-half times their respective regular rates of pay for all hours worked per workweek in excess of forty.

37. At all relevant times, Defendants were aware of the requirements to pay Plaintiffs and all FLSA Plaintiffs at the rate of one and one-half times their respective regular rates of pay for all hours worked each workweek above forty, yet they purposefully and willfully chose not to do so by misclassifying them as exempt.

38. The precise number of FLSA Plaintiffs should be readily available from a review of Defendants' personnel, scheduling, time, and payroll records, and from input received from the collective action as part of the notice and "opt-in" process provided by 29 U.S.C. § 216(b).

39. Thus, all FLSA Plaintiffs are victims of Defendants' pervasive practice of willfully refusing to pay their employees overtime compensation for all hours worked per workweek above forty, in violation of the FLSA.

## ADEA COLLECTIVE ACTION ALLEGATIONS

40. Plaintiffs seek to bring this suit to recover from Defendants damages for age discrimination and retaliation pursuant to the ADEA, 29 U.S.C. § 626(b), which incorporates the collective action procedures of the FLSA, 29 U.S.C. § 216(b), on their own behalf, as well as on behalf of those in the following collective:

> Current and former employees over the age of forty who, during the applicable ADEA limitations period, were subjected to Defendants' pattern and practice of age discrimination and/or retaliation, including the elimination of their positions and their replacement by substantially younger employees, and who consent to file a claim to recover damages under the ADEA ("ADEA Plaintiffs").

41. Defendants treated Plaintiffs and all ADEA Plaintiffs similarly in that Plaintiffs and all ADEA Plaintiffs were: (1) over the age of forty, and in most instances over the age of fifty-five; (2) subjected to the same discriminatory pattern and practice of eliminating older workers

while retaining and hiring substantially younger employees; and (3) subjected to the same retaliatory conduct after complaining about Defendants' unlawful wage and sales-tracking practices.

42. All seven members of the Luxury Team were over the age of fifty. The wholesale elimination of the entire team, every member of whom was over the age of fifty, followed immediately by the retention of a younger employee and the hiring of substantially younger replacements in their thirties, demonstrates that Defendants engaged in a common pattern and practice of age-based discrimination affecting all ADEA Plaintiffs.

43. The precise number of ADEA Plaintiffs is readily ascertainable from a review of Defendants' personnel records, and notice should be issued to all similarly situated employees to permit them to opt in to this action pursuant to 29 U.S.C. §§ 216(b) and 626(b).

## BACKGROUND FACTS

### ***Defendants Assemble the Luxury Team and Misclassify Its Members as Exempt***

44. In 2025, Defendants created the Luxury Team to promote their luxury resort brands, including the UNICO and Nobu properties, to high-end travel advisors, consortia, and affluent clientele. The team was assembled under the direction of Donna Smith, who served as the Luxury Team Director and who was herself sixty-five years old.

45. Ms. Smith recruited accomplished sales professionals with decades of industry experience. The Luxury Team ultimately consisted of seven members, every one of whom was over the age of fifty: Ms. Peaceman (age 65), Mr. Foley (age 61), Ms. Rubin (age 58), Ms. Elliott (age 59), Ms. Manzi (age 72), a colleague named Courtney Cook (over age 50), and Director Donna Smith (age 65).

46. Each Plaintiff was paid a base salary plus eligibility for a non-discretionary annual bonus or commission ranging from thirty to fifty percent of base salary, as set forth in their respective offer letters.

47. Defendants never provided Plaintiffs with written sales goals, individual performance metrics, or the formal Sales Incentive Plan referenced in their offer letters.

48. Defendants later claimed they could not verify the team's production, leaving Plaintiffs without any transparent basis to confirm the commissions and bonuses they had earned.

49. Throughout their employment, Plaintiffs regularly worked more than forty hours per week, including extensive domestic and international travel, overnight stays, mandatory attendance at conferences, trade shows, familiarization ("FAM") trips, and client events.

50. On average, even when not traveling, each of the Plaintiffs worked over 50 hours per week, every week, throughout their tenures.

51. Defendants classified every Plaintiff as exempt from overtime under the purported "outside sales" exemption and paid them no overtime compensation, even though Plaintiffs supervised no employees, had as their primary duty the making of sales, worked principally from fixed home offices by telephone and email, and were never paid any commissions for their sales.

52. Because Plaintiffs sold principally from their home offices by telephone and email, they were not customarily and regularly engaged away from the employer's place or places of business.

53. Moreover, despite regularly obtaining a commitment to buy from AIC's customer or clients, Defendants never credited Plaintiffs with any sales and never paid Plaintiffs any commissions based on their sales, lacking the central hallmark of outside sales status.

54. Notably, unlike Plaintiffs, other younger, "traditional team" salespersons were all paid regular commissions for their sales, and for the sales that Plaintiffs generated that were reassigned to them.

***Defendants Manipulate the Salesforce System and Deny Plaintiffs Their Earned Wages***

55. Salesforce was the central tool Defendants used to assign client accounts, track sales activities, and calculate the performance metrics that determined bonus and commission payments.

56. Throughout their tenure, Plaintiffs and their Luxury Team colleagues consistently reported that members of other teams and management personnel were improperly accessing Salesforce to reassign accounts, alter territory designations, and manipulate revenue figures in ways that diminished the Luxury Team's apparent performance while inflating the results of other teams.

57. Among those who reassigned and manipulated accounts were Luke Majewski, the Director of Groups, and Ellyn Gerstal, a Business Development Director on the Traditional Team.

58. This manipulation had direct financial consequences for Plaintiffs, because it created the appearance that Plaintiffs were unproductive in their roles and were therefore underperforming.

59. Moreover, Defendants repeatedly promised Plaintiffs that they would be eligible to earn commissions for their sales under a Sales Incentive Plan, despite that plan never materializing, further harming Plaintiffs and eliminating the basis for which they were entitled to commission payments.

60. When Plaintiffs raised these concerns with Ms. Smith, she advocated on their behalf to senior management, including Kevin Hernandez, the Global VP of Sales and Marketing, and Ash Tembe, then-Director of the Traditional Team.

61. In response, Mr. Majewski admitted in writing that "all account activity and changes are tracked in Salesforce and cannot be deleted except by administrators," directly contradicting Defendants' repeated claims that they could not verify the Luxury Team's sales.

62. Mr. Majewski further acknowledged that although the Company "may do $125M," only approximately $91 million was "registered and able to be identified and attached to a bdm," confirming the existence of substantial unattributed revenue.

63. Rather than investigate and remedy these improper practices, Defendants' response was to eliminate the entire Luxury Team after its members complained about these wage-related issues.

64. Defendants' disparate treatment of employees who did not complain further confirms their unlawful motive. Members of the Traditional Team and Host Team, who benefited from the manipulated Salesforce system, received quarterly commission payments throughout 2025. Plaintiffs, despite working longer hours and generating significant revenue for the Company, received either no commission or bonus payments at all, or token payments ranging from approximately $1,000 to $1,883 paid only after their termination and with no explanation of how those figures were calculated.

***A Pattern of Age-Based Animus***

65. Defendants' age-based animus was both explicit and pervasive. Ellyn Gerstal, a sixteen-year veteran of the Traditional Team, telephoned Mr. Foley to express her dissatisfaction

with Ms. Manzi's hiring, stating: "she's old and your boss is an idiot, why would they hire someone that age?"

66. Ms. Gerstal later told Ms. Manzi directly that she was "too old to do this job."

67. The disparate treatment of younger employees underscored the age-based nature of Defendants' conduct. In September 2025, Defendants hired a woman in her mid-twenties and placed her on the Traditional Team to cover portions of Ms. Manzi's Northeast territory. When Defendants later eliminated the Luxury Team, this younger employee, hired only months earlier, was retained.

68. Immediately after eliminating the Luxury Team, Defendants hired at least three substantially younger sales employees, all in their thirties, two individuals, Delia Osegueda and Francisco Rello, demonstrating that Plaintiffs could have easily continued working for Defendants.

***<u>Defendants Break Their Promises and Terminate the Entire Luxury Team</u>***

69. In mid-November 2025, Defendants abruptly terminated Donna Smith from her position as Luxury Team Director, sending immediate shockwaves through the team.

70. On November 17, 2025, Kevin Hernandez met with the Luxury Team and personally assured its members that their positions would be protected despite Ms. Smith's departure.

71. Shortly thereafter, Ash Tembe individually telephoned Luxury Team members, including Ms. Manzi, Mr. Foley, and Ms. Rubin, to guarantee that their jobs were safe, that their roles would be integrated into the Traditional Team, and that they had "nothing to worry about."

72. Mr. Tembe asked Mr. Foley to relay these assurances to the rest of the team and asked Ms. Manzi to provide him with the team members' email addresses, which she did.

73. These assurances were made at a critical juncture, discouraging team members from seeking alternative employment while they continued to generate substantial revenue for the Company through the holiday season, further underscoring the discriminatory and improper motives behind Defendants' unlawful conduct.

74. The promises proved hollow, as on Monday, January 5, 2026, the first business day after the year-end holiday break, Mr. Tembe convened a conference call of the entire Luxury Team. He was joined by Denny Garcia, an attorney who consulted for the Company on human resources matters. After Mr. Tembe spoke for approximately two minutes, Mr. Garcia announced that the Board of Directors had decided to eliminate all Luxury Team positions, effective immediately. The call lasted approximately ten minutes, and no substantive explanation was given for the terminations.

75. When team members asked about their final day of employment, Mr. Tembe fumbled, first stating it was that day, January 5th, then correcting himself to say it would be the following day, January 6th.

76. Although the team was told their email access would remain active through the end of business on January 6th to "clean up commitments and pending actions," within approximately forty-five to sixty minutes of the termination call, every Luxury Team member was locked out of the Company's email system and lost access to their work computers.

77. This abruptness prevented team members from preserving evidence of their work product, sales activities, and the very Salesforce data manipulation they had been complaining about for months.

***Ramona Manzi***

78. Defendants hired Ms. Manzi on June 16, 2025 as Regional Sales Executive for the Northeast, covering New York, New Jersey, Pennsylvania, and Delaware.

79. Her offer letter provided a $95,000 base salary plus eligibility for a thirty percent bonus, totaling $28,500 in potential annual bonus compensation.

80. Ms. Manzi left a position she had held for nineteen years, providing more than one month's notice, lured by Defendants' promise of approximately $30,000 in additional annual compensation.

81. Ms. Manzi performed exceptionally during her approximately six months of employment. Between September and November 2025, she hosted more than five client events, including advisor lunch training sessions, trade events, consumer events, and a national conference attended by over one hundred advisors, while meeting with consortia marketing managers to promote brand awareness and revenue across her Northeast territory.

82. Despite this performance, Ms. Manzi's territory reports and revenue numbers were constantly manipulated by other personnel in Salesforce, and advisors in her territory were marked off and taken from her.

83. Upon her termination, Defendants paid Ms. Manzi a single $1,000 payment labeled "commission," with no explanation of how the figure was calculated, despite her repeated requests for a formal incentive plan, territory goals, and performance metrics.

***Michael Foley***

84. Defendants hired Mr. Foley on April 7, 2025 as Sales Executive for New England, covering Massachusetts, Maine, Vermont, New Hampshire, Rhode Island, Connecticut, upstate New York, and Westchester County.

85. His offer letter provided an $85,000 base salary plus eligibility for a thirty percent bonus.

86. Mr. Foley brought approximately forty years of travel-industry experience to AIC, having marked his fortieth year in the profession in 2024.

87. On June 7, 2025, Defendants promoted Mr. Foley to Team Lead/Supervisor. This promotion was illusory: Mr. Foley had no direct reports, no hiring, firing, scheduling, or disciplinary authority, and received no increase in his bonus eligibility.

88. Mr. Foley worked extraordinary hours, with records reflecting months of 220 to 340 working hours and weekly averages as high as eighty hours during his busiest month, driven by extensive domestic and international travel.

89. His accounts were repeatedly targeted and reassigned, and Ms. Gerstal continued to take his clients and alter or delete his Salesforce entries even after an August 2025 policy supposedly limited account changes to management only.

90. In approximately June 2025, at a company lunch attended by clients, Ms. Gerstal made sexually explicit remarks directed at Mr. Foley in the presence of a younger Host Team member, demonstrating the hostile and unprofessional environment Defendants tolerated from their favored employees.

91. Defendants terminated Mr. Foley’s employment on January 6, 2026 and paid him a $1,500 payment labeled “bonus,” with no explanation of how the figure was calculated. Based on his contract terms, Mr. Foley is owed a minimum of $19,125 in unpaid commission and bonus compensation.

***Alene Peaceman***

92. Defendants hired Ms. Peaceman on January 22, 2025 as the first Sales Executive on the Luxury Team, covering the California territory.

93. Her offer letter provided a $90,000 base salary plus eligibility for a fifty percent bonus, the highest percentage on the team, totaling $45,000 in potential annual bonus compensation. She was also promised complimentary hotel nights annually.

94. Ms. Peaceman generated significant business for Defendants, including a Rosanna Herd corporate incentive group booked to Nobu Hotel Los Cabos worth approximately $126,000, a Pique Travel group booked to UNICO Riviera Maya worth approximately $239,000, and additional groups through Travel Wizards and other agencies.

95. Ms. Peaceman's sales activity was repeatedly manipulated. After the Rosanna Herd booking closed, Hannah O'Brian, a younger Core Team member, emailed Ms. Herd on October 20, 2025 introducing herself as Ms. Herd's new Business Development Manager, despite Ms. Herd having originated the lead with Ms. Peaceman. Only after a protracted email exchange by Ms. Peaceman and Ms. Smith did Mr. Majewski concede that the account belonged to Ms. Peaceman.

96. Upon her termination on January 5, 2026, Defendants paid Ms. Peaceman an unexplained "commission" of approximately $1,883, with no documentation or metrics to substantiate the figure."

97. She remains owed her full $45,000 bonus and commissions on her closed groups.

***Michelle Rubin***

98. Defendants hired Ms. Rubin in mid-2025 as a Sales Executive covering California, at a $90,000 base salary plus eligibility for a thirty percent bonus, totaling $27,000 in potential annual bonus compensation.

99. Her employment lasted approximately six months and ended with the rest of the team on January 5, 2026.

100. Ms. Rubin meticulously documented at least 182 hours of overtime beyond her standard forty-hour workweeks, including training in Miami, familiarization trips to Nobu Los Cabos and UNICO Riviera Nayarit, advisor presentation dinners, and California industry events. Defendants paid her nothing for any of this overtime.

101. Upon her termination, Ms. Rubin received only a token payment and did not receive her final paycheck or her accrued vacation pay, independently triggering waiting-time penalties under California Labor Code § 203.

102. Like Ms. Peaceman, Ms. Rubin saw a market she had built handed to the substantially younger Ms. O'Brian.

103. She remains owed her full $27,000 bonus and her unpaid overtime.

***<u>Leslie Elliott</u>***

104. Defendants hired Ms. Elliott on March 24, 2025 as a Regional Sales Executive at an $85,000 base salary plus eligibility for a thirty percent bonus.

105. Her territory initially covered Texas, Arizona, and Colorado, and later expanded to include Oklahoma, Louisiana, Arkansas, New Mexico, portions of the Chicago market, and American Express and Centurion accounts.

106. Ms. Elliott's experience best illustrates the Salesforce manipulation at the center of this case. On her first day, Mr. Majewski told her to "wait to begin entering data because she was part of the Luxury Sales Team," while accounts she was to own were reassigned in Salesforce.

107. Her recorded production, which exceeded $500,000 before October 22, 2025, later dropped to approximately $459,000.

108. She learned that her clients and bookings were being redirected to Daniella Sevilla, a younger employee hired after her.

109. Ms. Elliott's uncredited bookings included a UNICO wedding booking originated through ISWD Events, a UNICO booking of approximately $26,935 through Classic Vacations, a UNICO booking, and a Nobu Los Cabos booking of approximately $25,000 through Frosch Travel.

110. Upon her termination, Defendants paid Ms. Elliott a token "commission" of $1,166.

111. Like each Plaintiff, Ms. Elliott worked well in excess of forty hours per week without any overtime compensation and was terminated as part of Defendants' elimination of the entire Luxury Team based on age and in retaliation for the team's protected complaints.

112. As a direct and proximate result of Defendants' unlawful conduct, each Plaintiff has suffered, and continues to suffer, substantial monetary and economic damages, including lost wages, unpaid overtime, unpaid commissions and bonuses, and lost benefits, as well as severe emotional distress, mental anguish, humiliation, embarrassment, anxiety, and loss of self-esteem and self-confidence.

113. Each time that Defendants paid Plaintiffs, they failed to provide Plaintiffs with accurate wage statements that accurately set forth their actual hours worked, or their overtime hours or overtime rates of pay.

114. What is more, Defendants never provided Plaintiff Manzi with an accurate wage notice up on her hire that included, *inter alia*, her eligibility to receive overtime, her actual rate of pay, and her overtime rate of pay.

115. Plaintiffs suffered concrete injuries in fact due to Defendants' failure to provide them with timely and accurate wage statements on each pay day or a timely and accurate wage

notice upon hire because, lacking any real documentation from Defendants that confirmed their eligibility for overtime pay, and that showed their true hours and pay, they felt unable to meaningfully advocate for themselves and others due to the lack of accurate information provided to them during each pay period.

116. If Plaintiffs' paystubs accurately reflected the actual hours they worked and had worked, and if they would have been made aware upon hire what they was entitled to be paid for all hours before and after their on-the-clock shifts, and at time and one-half their regular rates of pay for all hours over forty, Plaintiffs would have been able to advocate for themselves and for their coworkers to be paid higher wages during their employment, exactly as Plaintiffs did when confronted with Defendants' other unlawful practices relating to unsafe working conditions and other more obvious labor violations, resulting in their unlawful retaliatory terminations -- just as they are now doing through this action upon independently learning of their rights to be paid overtime.

117. Indeed, because Plaintiffs were not aware that they should have received compensation for the work before and after their shifts, and that they should have received overtime compensation for all hours over forty, Plaintiffs waited more than a year before raising their wage complaints against Defendants, causing them to lose the time-value of the money they should have earned if they were accurately appraised of their total hours worked each week without receiving pay for all of those hours at the correct rat

**FIRST CLAIM FOR RELIEF AGAINST DEFENDANTS**

*Unpaid Overtime under the FLSA*

*(On Behalf of All Plaintiffs and FLSA Plaintiffs)*

118. Plaintiffs and FLSA Plaintiffs repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

119. 29 U.S.C. § 207(a) requires employers to compensate their employees at a rate not less than one and one-half times their regular rate of pay for all hours worked exceeding forty in a workweek.

120. As described above, Defendants are "employers" within the meaning of the FLSA, while Plaintiffs and FLSA Plaintiffs are "employees" within the meaning of the FLSA.

121. Plaintiffs and FLSA Plaintiffs worked in excess of forty hours per week, yet Defendants failed to compensate them in accordance with the FLSA's overtime provisions. Defendants' sole justification for their failure to pay overtime was the purported "outside sales" exemption, which does not apply because Plaintiffs sold principally from their home offices, supervised no employees, and were never paid any commissions for their sales.

122. Defendants willfully violated the FLSA by misclassifying Plaintiffs and FLSA Plaintiffs as exempt and refusing to pay them any overtime compensation despite knowingly requiring them to work in excess of forty hours each week.

123. Plaintiffs and FLSA Plaintiffs are entitled to overtime pay for all hours worked per week in excess of forty at the rate of one and one-half times their respective regular rates of pay.

124. Plaintiffs and FLSA Plaintiffs are also entitled to liquidated damages, interest, attorneys' fees, and costs for Defendants' violations of the FLSA's overtime provisions.

**SECOND CLAIM FOR RELIEF AGAINST DEFENDANTS**

*Age Discrimination under the ADEA*

*(On Behalf of All Plaintiffs and ADEA Plaintiffs)*

125. Plaintiffs and ADEA Plaintiffs repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

126. The ADEA, 29 U.S.C. § 621 et seq., prohibits employers from discriminating against employees who are forty years of age or older in the terms, conditions, and privileges of their employment on the basis of their age.

127. As described above, Defendants are "employers" within the meaning of the ADEA, while Plaintiffs and ADEA Plaintiffs are protected "employees" within the meaning of the ADEA.

128. Defendants discriminated against Plaintiffs and ADEA Plaintiffs on the basis of their age by, among other things, subjecting them to age-based animus, systematically undermining their ability to earn commissions, eliminating the positions of the entire Luxury Team, every member of which was over the age of fifty, and simultaneously retaining and hiring substantially younger, less experienced employees to perform the same work.

129. Defendants' stated justification of a "business decision" to eliminate the Luxury Team was a pretext for age discrimination, as demonstrated by Defendants' explicit age-based remarks, their retention of a younger employee hired months earlier, and their hiring of substantially younger replacements immediately after the terminations.

130. As a direct and proximate result of Defendants' unlawful discriminatory conduct, Plaintiffs and ADEA Plaintiffs have suffered, and continue to suffer, economic damages, including lost wages and benefits, as well as emotional distress, for which they are entitled to an award of monetary damages and other relief.

131. Defendants' violations of the ADEA were willful, entitling Plaintiffs and ADEA Plaintiffs to an award of liquidated damages.

**THIRD CLAIM FOR RELIEF AGAINST DEFENDANTS**

*Retaliation under the ADEA*

*(On Behalf of All Plaintiffs and ADEA Plaintiffs)*

132. Plaintiffs and ADEA Plaintiffs repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

133. The ADEA prohibits employers from retaliating against employees because they have opposed any practice made unlawful by the ADEA or otherwise engaged in protected activity.

134. As described above, Plaintiffs and ADEA Plaintiffs engaged in protected activity by repeatedly complaining to Defendants' management, including Donna Smith, Kevin Hernandez, and Ash Tembe, about Defendants' manipulation of the Salesforce system and their failure to pay earned wages, commissions, and bonuses.

135. Rather than investigate or remedy those complaints, Defendants retaliated against Plaintiffs and ADEA Plaintiffs by reassigning their accounts, excluding them from company meetings, and ultimately eliminating their positions.

136. As a direct and proximate result of Defendants' unlawful retaliatory conduct, Plaintiffs and ADEA Plaintiffs have suffered, and continue to suffer, economic damages and emotional distress, for which they are entitled to an award of monetary damages, liquidated damages, and other relief.

**FOURTH CLAIM FOR RELIEF AGAINST DEFENDANTS**

*Underpayment of Wages in Violation of NYLL § 194*

*(On Behalf of Plaintiff Manzi Only)*

137. Ms. Manzi repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

138. NYLL § 194 prohibits an employer from paying an employee, because of her status as a member of one or more protected classes, including age, a wage at a rate less than the rate at

which the employer pays employees who are not members of the same protected class for equal work, or for substantially similar work when viewed as a composite of skill, effort, and responsibility performed under similar working conditions.

139. As described above, Defendants are an "employer" within the meaning of the NYLL, while Ms. Manzi is an "employee" and a member of a protected class, namely employees protected on the basis of their age.

140. Defendants paid Ms. Manzi less than substantially younger employees who performed equal or substantially similar work, by failing to pay her any overtime compensation, failing to pay her any commissions for her sales, and failing to pay her the non-discretionary bonus to which she was entitled, while routinely paying younger employees their commissions and bonuses throughout 2025.

141. The differential in pay between Ms. Manzi and younger employees was not based on seniority, merit, quantity or quality of production, or any factor other than age.

142. As a result of Defendants' conduct, Ms. Manzi has suffered and continues to suffer harm, including lost wages and benefits, and is entitled to all remedies available under NYLL § 194, including her unpaid wages, commissions, and bonuses, liquidated damages, interest, and attorneys' fees and costs.

## FIFTH CLAIM FOR RELIEF AGAINST DEFENDANTS

*Retaliation in Violation of NYLL § 215*

*(On Behalf of Plaintiff Manzi Only)*

143. Ms. Manzi repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

144. NYLL § 215 prohibits an employer from discharging, penalizing, or in any other manner discriminating or retaliating against any employee because such employee has made a complaint that the employer has violated any provision of the NYLL.

145. As described above, Ms. Manzi engaged in protected activity by complaining about Defendants' manipulation of her sales data and their failure to pay her earned wages, commissions, and bonuses.

146. Defendants retaliated against Ms. Manzi in violation of NYLL § 215 by reassigning her accounts, failing to pay her earned wages, and ultimately terminating her employment.

147. As a direct and proximate result of Defendants' unlawful retaliatory conduct, Ms. Manzi has suffered, and continues to suffer, economic harm and emotional distress, for which she is entitled to an award of monetary damages, liquidated damages, interest, and attorneys' fees and costs.

**SIXTH CLAIM FOR RELIEF AGAINST DEFENDANTS**
*Age Discrimination in Violation of M.G.L. c. 151B*
*(On Behalf of Plaintiff Foley Only)*

148. Mr. Foley repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

149. The Massachusetts Fair Employment Practices Act, M.G.L. c. 151B, prohibits employers from discriminating against employees in the terms, conditions, and privileges of their employment on the basis of age.

150. As described above, Defendants discriminated against Mr. Foley on the basis of his age by subjecting him to age-based animus, undermining his ability to earn commissions, and terminating his employment while retaining and hiring substantially younger employees.

151. Defendants committed these violations with knowledge, or reason to know, that their conduct was unlawful, entitling Mr. Foley to liquidated damages of up to three times the amount of his actual damages under M.G.L. c. 151B, § 9.

152. As a direct and proximate result of Defendants' unlawful discriminatory conduct, Mr. Foley has suffered, and continues to suffer, economic damages and emotional distress, for which he is entitled to an award of monetary damages, treble damages, and other relief.

**SEVENTH CLAIM FOR RELIEF AGAINST DEFENDANTS**
*Failure to Pay Wages and Commissions in Violation of M.G.L. c. 149, § 148*
*(On Behalf of Plaintiff Foley Only)*

153. Mr. Foley repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

154. The Massachusetts Wage Act, M.G.L. c. 149, § 148, requires employers to timely pay their employees all wages earned, including commissions that are definitely determined and due and payable.

155. As described above, Defendants failed to pay Mr. Foley his earned overtime wages and the commissions and bonus to which he was entitled, instead paying him a token $1,500 payment with no explanation.

156. Mr. Foley exhausted his administrative remedies by obtaining authorization from the Office of the Massachusetts Attorney General to pursue a private right of action under M.G.L. c. 149, § 150.

157. As a result of Defendants' violations of the Massachusetts Wage Act, Mr. Foley is entitled to recover his unpaid wages and commissions, together with mandatory treble damages, interest, and attorneys' fees and costs.

**EIGHTH CLAIM FOR RELIEF AGAINST DEFENDANTS**
*Retaliation in Violation of M.G.L. c. 149, § 148A*
*(On Behalf of Plaintiff Foley Only)*

158. Mr. Foley repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

159. M.G.L. c. 149, § 148A prohibits employers from retaliating against any employee who complains about or asserts rights under the Massachusetts wage laws.

160. As described above, Mr. Foley engaged in protected activity by complaining about Defendants' manipulation of sales data and their failure to pay earned wages and commissions.

161. Defendants retaliated against Mr. Foley by reassigning his accounts, disparaging his professional reputation, and terminating his employment.

162. As a direct and proximate result of Defendants' unlawful retaliatory conduct, Mr. Foley has suffered, and continues to suffer, economic damages and emotional distress, for which he is entitled to an award of monetary damages, treble damages, interest, and attorneys' fees and costs.

**NINTH CLAIM FOR RELIEF AGAINST DEFENDANTS**
*Failure to Pay Commissions and Furnish Accurate Wage Statements in Violation of the California Labor Code*
*(On Behalf of Plaintiffs Peaceman and Rubin Only)*

163. Ms. Peaceman and Ms. Rubin repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

164. The California Labor Code requires employers to pay their employees all earned wages and commissions, to provide written commission agreements describing the method by which commissions are computed and paid, and to furnish accurate itemized wage statements.

165. As described above, Defendants failed to pay Ms. Peaceman and Ms. Rubin their earned commissions and bonuses, failed to provide them with a written plan documenting how

their commissions were computed, and failed to furnish accurate wage statements reflecting their earned wages and the hours they worked.

166. As a result of Defendants' violations of the California Labor Code, Ms. Peaceman and Ms. Rubin are entitled to recover their unpaid wages and commissions, statutory penalties, interest, and attorneys' fees and costs.

**TENTH CLAIM FOR RELIEF AGAINST DEFENDANTS**

*Waiting Time Penalties in Violation of California Labor Code § 203*

*(On Behalf of Plaintiff Rubin Only)*

167. Ms. Rubin repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

168. California Labor Code § 203 provides that an employer that willfully fails to pay all wages due to an employee upon the end of her employment is liable for a waiting-time penalty equal to the employee's daily wage for each day the wages remain unpaid, up to thirty days.

169. As described above, Defendants willfully failed to pay Ms. Rubin her final paycheck and accrued vacation pay upon her termination, which, to-date, still remain unpaid.

170. As a result of Defendants' violation of California Labor Code § 203, Ms. Rubin is entitled to recover waiting-time penalties, together with interest and attorneys' fees and costs.

**ELEVENTH CLAIM FOR RELIEF AGAINST DEFENDANTS**

*Retaliation in Violation of the California Labor Code*

*(On Behalf of Plaintiffs Peaceman and Rubin Only)*

171. Ms. Peaceman and Ms. Rubin repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

172. The California Labor Code prohibits employers from retaliating against employees because they have complained about, or asserted rights relating to, unpaid wages and unlawful employment practices.

173. As described above, Ms. Peaceman and Ms. Rubin engaged in protected activity by complaining about Defendants' manipulation of their sales data and their failure to pay earned wages, commissions, and bonuses.

174. Defendants retaliated against Ms. Peaceman and Ms. Rubin by reassigning their accounts, denying them their earned compensation, and terminating their employment.

175. As a direct and proximate result of Defendants' unlawful retaliatory conduct, Ms. Peaceman and Ms. Rubin have suffered, and continue to suffer, economic damages and emotional distress, for which they are entitled to an award of monetary damages, statutory penalties, interest, and attorneys' fees and costs.

**TWELFTH CLAIM FOR RELIEF AGAINST DEFENDANTS**

*Failure to Furnish Proper Wage Notice in Violation of NYLL § 195(1)*

*(On Behalf of Plaintiff Manzi, Only)*

176. Plaintiff Manzi repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

177. NYLL § 195(1) requires that employers provide employees with a wage notice at the time of hire containing accurate, specifically enumerated criteria.

178. As described above, Defendants are "employers" within the meaning of the NYLL, while Plaintiff Manzi is an "employee" within the meaning of the NYLL.

179. As also described above, Defendants failed to furnish Plaintiff Manzi with an accurate wage notice at hire that contained all of the criteria required under the NYLL, specifically failing to include accurate information regarding her regular hourly rate of pay, overtime rate of pay, and eligibility for overtime compensation.

180. As a result of Defendants' failure to provide accurate wage notices, Plaintiff Manzi has suffered informational injuries and concrete injuries-in-fact as she was misled about her

overtime eligibility and compensation structure, preventing them from advocating for proper wages and understanding their rights under New York law.

181. Pursuant to NYLL § 198(1-b), Defendants are liable to Plaintiff Manzi in the amount of $50.00 for each workday after the violations initially occurred, up to a statutory cap of $5,000.00.

## THIRTEENTH CLAIM FOR RELIEF AGAINST DEFENDANTS

*Failure to Furnish Proper Wage Statements in Violation of NYLL § 195(3)*
*(On Behalf of Plaintiff Manzi, Only)*

182. Plaintiff Manzi repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

183. NYLL § 195(3) requires that employers furnish employees with wage statements containing accurate, specifically enumerated criteria on each occasion when the employer pays wages to the employee.

184. As described above, Defendants are "employers" within the meaning of the NYLL, while Plaintiff Manzi is an "employee" within the meaning of the NYLL.

185. As also described above, Defendants, on each payday, failed to furnish Plaintiff Manzi with accurate wage statements containing all of the criteria required under the NYLL, specifically failing to include accurate information regarding total hours worked, overtime hours worked, overtime rate of pay, and accurate gross wages earned.

186. As a result of Defendants' failure to provide accurate wage statements on each payday, Plaintiff Manzi has suffered informational injuries and concrete injuries-in-fact, as she could not ascertain whether she was being paid correctly, could not track unpaid overtime compensation owed to her, and was prevented from advocating for herself and her statutory wage rights.

187. Pursuant to NYLL § 198(1-d), Defendants are liable to Plaintiff Manzi in the amount of $250.00 for each workday that the violations occurred, up to a statutory cap of $5,000.00

## DEMAND FOR A JURY TRIAL

188. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs, FLSA Plaintiffs, and ADEA Plaintiffs demand a trial by jury on all issues of fact and damages stated herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, FLSA Plaintiffs, and ADEA Plaintiffs respectfully demand judgment against Defendants as follows:

A. A judgment declaring that the practices complained of herein are unlawful and in violation of the aforementioned United States, New York, Massachusetts, and California laws;

B. Preliminary and permanent injunctions against Defendants and their officers, owners, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful practices, policies, customs, and usages set forth herein;

C. An order restraining Defendants from any retaliation against Plaintiffs, FLSA Plaintiffs, and/or ADEA Plaintiffs for participation in any form in this litigation;

D. Designation of this action as an FLSA collective action on behalf of Plaintiffs and FLSA Plaintiffs and prompt issuance of notice pursuant to 29 U.S.C. § 216(b), apprising similarly situated individuals of the pendency of this action, permitting them to assert timely FLSA claims by filing individual Consents to Sue, and tolling of the statute of limitations;

E. Designation of this action as a collective action under the ADEA, 29 U.S.C. § 626(b), and prompt issuance of notice to all similarly situated individuals permitting them to opt in to this action;

F. An award of all unpaid overtime compensation due and owing to Plaintiffs and FLSA Plaintiffs, plus liquidated damages, interest, and attorneys' fees and costs as provided under the FLSA;

G. An award of all unpaid commissions and bonuses, back pay, front pay, and lost benefits that Plaintiffs would have received but for Defendants' unlawful conduct;

H. An award of liquidated damages under the ADEA for Defendants' willful violations, and compensatory damages for Plaintiffs' emotional distress;

I. An award to Ms. Manzi of all damages available under NYLL §§ 194 and 215, including her unpaid wages, commissions, and bonuses, liquidated damages, interest, and attorneys' fees and costs;

J. An award to Mr. Foley of all damages available under M.G.L. c. 151B and M.G.L. c. 149, §§ 148 and 148A, including treble damages, interest, and attorneys' fees and costs;

K. An award to Ms. Peaceman and Ms. Rubin of all damages available under the California Labor Code, including unpaid wages and commissions, waiting-time penalties under California Labor Code § 203 as to Ms. Rubin, statutory penalties, interest, and attorneys' fees and costs;

L. An award of damages to compensate Plaintiffs for all non-monetary and/or compensatory damages, including compensation for their mental anguish and emotional distress, humiliation, embarrassment, anxiety, and loss of self-esteem and self-confidence;

M. An award of punitive damages to the extent authorized by law;

N. An award of the costs and disbursements of this action, including reasonable attorneys' fees and expert witness fees;

O. Pre-judgment and post-judgment interest, as provided by law; and

P. Granting Plaintiffs, FLSA Plaintiffs, and ADEA Plaintiffs such other and further relief as this Court finds necessary and proper.

Dated: Deer Park, New York
October 9, 2026

Respectfully submitted,

**STEVENSON MARINO LLP**

By: ______________________________

Michael R. Minkoff, Esq.
2000 Deer Park Avenue
Deer Park, New York 11729
Tel.: (212) 939-7231
Fax: (212) 531-6129
mminkoff@stevensonmarino.com
*Attorneys for Plaintiffs and the Putative Collective*